UNITED STATES of America, Plaintiff,

v.

Willard WILLIAMS, a/k/a "Felix Davis," a/k/a "Trees," a/k/a "Mr. William," a/k/a "The Black Prince," Anthony Michael Porcelli a/k/a "Porky," Robert Angelo Guippone, a/k/a "Sonny," Saint Julian Harrison, a/k/a "Harry," a/k/a "James Harrison," a/k/a "Mr. Simmons," a/k/a "Edward Carey," Mahlon Joseph Steward, a/k/a "Bunny," a/k/a "Little Lips," John Doe, a/k/a "Jack," Onzelo Markum, a/k/a "Junior," Clarence Hanes, a/k/a "Legs," John Doe, a/k/a "Piggy," Eric Nalven, William Jenkins, a/k/a "Pete," a/k/a "Pete Smalls," John Doe, a/k/a "Pighee McCoy," Sonya Santos, Michael Cavagrotti, Cindy Cavagrotti, Sheila Williams, Yolanda King, a/k/a "Lonnie," Defendants.

No. 81 Cr. 398.

United States District Court,
S. D. New York.

Dec. 1, 1981.

Supplemental Opinion Dec. 3, 1981.

John S. Martin, Jr., U. S. Atty., S. D. N. Y., New York City, for the Government; Richard A. Martin and Lawrence F. Ruggiero, Asst. U. S. Attys., New York City, of counsel.

Jay Goldberg, New York City, for defendant Willard Williams.

Paul A. Victor, New York City, for defendant Robert Angelo Guippone; Martin G. Weinberg, of counsel.

Murray Richmond, New York City, for defendant Anthony Michael Porcelli; Martin G. Weinberg, of counsel.

Salvatore F. Quagliata, Ozone Park, N. Y., for defendant St. Julian Harrison.

Eugene Bogan, New York City, for defendant Onzelo Markum.

Paul Greenfield, New York City, for defendant Yolanda King.

Ronald J. Margolis, New York City, for defendant Sheila Williams.

Barry I. Slotnick, New York City, for defendant Michael Cavagrotti.

Caesar D. Cirigliano, New York City, for defendant William Mifflin; James A. Cohen, New York City, of counsel.

Barry Asness, New York City, for defendant Gloria Quintana.

Victor J. Herwitz, New York City, for defendant Gabriel McMillan.

Thomas H. Sear, Spengler, Carlson, Gubar, Brodsky & Rosenthal, New York City, for defendant Mahlon Steward.

Robert L. Herbst, White Plains, N. Y., for defendant Willie Terry.

Richard Berne, New York City, for defendant Cindy Cavagrotti.

William B. Jacobs, Brooklyn, N. Y., for defendant Ricardo Bedoya.

## OPINION AND ORDER

OWEN, District Judge.

On February 18, 1981, Judge Robert J. Ward of this court found that there was probable cause to believe that a heroin ring was operating out of the apartment of defendant Willard Williams at 309 East 89th Street in Manhattan. Pursuant to that finding, Judge Ward signed an order authorizing the placement of electronic listening devices ("bugs") in Williams's living room in order to obtain oral evidence of the commission of narcotics-related crime. The order expressly provided that the government might "intercept oral communications of ... [defendants Williams, Porcelli, Guippone, Steward,] Jones, and others as yet unknown from the premises known as the first floor of duplex apartment J ...." Standard bugs with a range of ten to fifteen feet were thereafter surreptitiously installed in the apartment, and for the following sixty days conversations intercepted by these bugs were monitored and tape-recorded by agents of the Drug Enforcement Agency ("DEA") who were stationed in an apartment across the street.[1] During this

1. The order was renewed on April 2, 1981 for    an additional thirty days.

surveillance period, the agents recorded a considerable number of conversations of the defendants herein; it is undisputed that the subject matter of those conversations is within the scope of Judge Ward's order.

After indictment, defendants moved to suppress all the intercepted communications as the fruits of an unlawful general search. The theory of defendants' motion, which was based on defendant Williams's testimony and some stray language on the tapes themselves, was that certain of the bugged conversations took place in Williams's bedroom.[2] This, defendants argued, proved that there had been an illegal bug in the bedroom, which thereby voided the entire electronic interception and necessitated the suppression of all the tapes. Williams's bedroom, which at one time had been a separate apartment designated "1J", was located immediately above the living room and was connected to the living room by a set of open stairs. The stairs rose from the living room through a large aperture to the bedroom floor at a point a few feet from Williams's bed and close to a projection television screen.

■ I held several days of hearings on the "bug-in-the-bedroom" issue. I now find as a fact that there was no bug in defendant Williams's bedroom. I find that two bugs were placed in the living room by New York City Police officers posing as telephone repairmen. One bug was placed in the telephone wall "jack" located on the baseboard of the wall; the other was placed in the base of a standard telephone with a standard wall cord connecting it to the bugged jack. I also find that, for his own convenience, Williams kept this telephone on one of the middle-to-upper steps of the stairway, which in fact was no more than a

few feet from his bed and the projection television screen.[3] Even while on the stairs however, the telephone, with the bug inside it, remained in the living room. Accordingly, I conclude that the bug was at all times located in compliance with the order of Judge Ward.

As it became apparent during the hearing that there was no bug in the bedroom, defendants shifted the grounds of their suppression motion. They now contend that the agents were intercepting conversations which they knew or should have known were taking place in the adjoining upstairs bedroom—albeit only a few feet from the bug—and that the agents had a duty at that point either to stop monitoring or to come back to the court for an extension of the limits of the eavesdropping order. Concededly, they did neither.

■ To pursue this new inquiry, defendants now seek to interrogate the monitoring agents as to their states of mind during the two months of bugging in order to determine whether, at the time an agent was monitoring any particular conversation, that agent knew or had reason to believe that that conversation was coming from the bedroom.[4] Of the some twenty monitoring agents, defendants demand, at least at first, that five be produced. Contending that the seizure of any conversations from the bedroom was prohibited, defendants argue that if an agent or agents can be shown to have had an awareness that various conversations came from the bedroom, then all the fruits of the electronic eavesdropping must be suppressed.[5]

■ Upon reading the court's order itself, in light of the language of and the principles inherent in both the Constitution

2. Williams apparently has medical problems with his feet and therefore spent a lot of his waking time on his bed.

3. Williams had two other phones with different phone numbers which were both located upstairs. Neither phone had any involvement whatsoever with the matter before me.

4. The government recorded over 1900 individual conversations.

5. Defendants seek to bolster their legal position by reference to certain oral and written instructions which the government gave to the monitoring agents and which direct in essence that only conversations in the living room were to be intercepted. The government's overly restrictive interpretation of the scope of the agents' authority does not, however, establish the law or bind this court.

and Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510 et seq., I decline to pursue this line of inquiry, and I do not, nor need I, make any findings of fact in this area. In the order authorizing the bugging, Judge Ward found that there was probable cause to believe that Williams was trafficking in narcotics and that his living room was being used for that purpose. Based on this finding, Judge Ward authorized the DEA agents to install bugs in the living room. They did exactly that. They were told that they could intercept "from" that living room oral communications pertaining to narcotics activity. Again, they did exactly that. The communications which they recorded from that living room were audible in the living room and thus were geographically within the scope of the order. Consequently, whether or not an agent or agents knew or had reason to believe that the conversation being bugged at any given time came from the adjacent bedroom is irrelevant. A rule mandating the suppression of incriminating conversations which were audible in the very room which a court has designated for the placement of a bug would, in my opinion, make a mockery of the Constitution and Title III.[6] The Fourth Amendment assures "the right of the people to be secure in their . . . houses against unreasonable searches and seizures, . . ." It was designed to protect the citizenry from the abuse of power by the sovereign. It was not designed to protect an alleged narcotics dealer from a prosecution based upon his incriminating conversations which were overheard by a court-authorized listening device located in exactly the room in which the court permitted the interception to occur.

■ In sum, I conclude that the bugs were lawfully situated in the living room and that any conversation dealing with nar-

cotics trafficking which they overheard, whether or not the agents knew it was occurring in an adjoining room, was lawfully intercepted and is therefore admissible on the trial herein. Accordingly, leave to defendants to pursue this new line of inquiry is denied, and defendants' motion to suppress the fruits of the electronic surveillance authorized by Judge Ward is denied in its entirety. The trial in this case will commence on January 14, 1982 at 10:00 a. m.

The foregoing is so ordered.

## SUPPLEMENTAL OPINION

■ During the course of the hearings on the motion of Willard Williams and others to suppress the fruits of an electronic eavesdropping in Williams's apartment in the spring of 1981, a subsidiary issue was raised as to whether there was an unauthorized, and hence an illegal, wiretap on the very telephone that was used as part of the circuitry for the bug. (See this court's opinion of December 1 denying the motion to suppress the fruits of that eavesdropping. Familiarity with that opinion is herein presumed.)

The basis for the defendant's claim of an illegal wiretap is that on certain of the bugging tapes, one can hear both the person making the telephone call and—albeit much more faintly—the caller. This, counsel contends, is evidence that there was an illegal wiretap bugging the telephone conversation itself.

I disagree with counsel's contention. The phenomenon of the caller's faint voice being heard on the tapes is easily explained by the fact that one of the bugs was in the base of the telephone itself. It was conceded, even by defendants' alleged expert, one Shawky Aziz (whose testimony in all other material respects I do not credit), that if the earpiece

6. For example, consider a conversation in which one speaker is in the living room and the other is just across the doorsill in the dining room and statements of both are picked up by the bug. Is the government to be denied such evidence of narcotics trafficking, or denied half of it? Is the boundary between lawful and

unlawful eavesdropping a doorsill which a monitoring agent cannot even see?

I note that this is not a case where the bug employed was so sensitive that it could pick up conversations that were not audible to the human ear. That may present a different issue, but such an issue is not now before me.

of the phone is held the slightest distance from the ear, the words of the caller would be audible in the room and thus be picked up by the bug. This is obviously what happened. Indeed, the government demonstrated this phenomenon to me by calling my courtroom phone from a phone booth in the corridor.

Given the foregoing, I find that there was no such wiretap, let alone an illegal wiretap of the telephone No. (212) 876–3282. Thus defendant's allegation of illegality is dismissed.

So ordered.